# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH
INFORMATION SHEET

Mozdak Taghioskoui _____   Case Number: _____ 0007207-12

vs   Date: _____

The George Washington University ☐ One of the defendants is being sued
in their official capacity.

| Name. *(Please Print)* James Charles Bailey | Relationship to Lawsuit |
|---|---|
| Firm Name: Bailey & Ehrenberg | ☒ Attorney for Plaintiff |
| Telephone No.: 202-331-1331   Six digit Unified Bar No.: 462391 | ☐ Self (Pro Se) |
| | ☐ Other: _____ |

TYPE OF CASE:  ☐ Non-Jury   ☒ 6 Person Jury   ☐ 12 Person Jury
Demand: $ 1,000,000.00   Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____   Judge: _____   Calendar #: _____

Case No.: _____   Judge: _____   Calendar#: _____

---

NATURE OF SUIT   *(Check One Box Only)*

**A. CONTRACTS**                                     **COLLECTION CASES**

☒ 01 Breach of Contract   ☐ 07 Personal Property   ☐ 14 Under $25,000 Pltf. Grants Consent
☐ 02 Breach of Warranty   ☐ 09 Real Property-Real Estate   ☐ 16 Under $25,000 Consent Denied
☐ 06 Negotiable Instrument   ☐ 12 Specific Performance   ☐ 17 OVER $25,000
☐ 15 Special Education Fees   ☐ 13 Employment Discrimination

**B. PROPERTY TORTS**

☐ 01 Automobile   ☐ 03 Destruction of Private Property   ☐ 05 Trespass
☐ 02 Conversion   ☐ 04 Property Damage   ☐ 06 Traffic Adjudication
☐ 07 Shoplifting, D C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process   ☐ 09 Harassment   ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection   ☐ 10 Invasion of Privacy   Not Malpractice)
☐ 03 Assault and Battery   ☐ 11 Libel and Slander   ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury   ☐ 12 Malicious Interference   ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)   ☐ 13 Malicious Prosecution   ☐ 20 Friendly Suit
☐ 06 False Accusation   ☐ 14 Malpractice Legal   ☐ 21 Asbestos
☐ 07 False Arrest   ☐ 15 Malpractice Medical (Including Wrongful Death)   ☐ 22 Toxic/Mass Torts
☐ 08 Fraud   ☐ 16 Negligence- (Not Automobile,   ☐ 23 Tobacco
   Not Malpractice)   ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE ☐ IF USED

CV-496/Aug 12

12 1740

**FILED**

OCT 2 5 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia



EXHIBIT

A

# Information Sheet, Continued

**C. OTHERS**

I.

| | | |
|---|---|---|
| ☐ 01 Accounting | ☐ 10 T.R.O./ Injunction | ☐ 25 Liens: Tax/Water Consent Granted |
| ☐ 02 Att Before Judgment | ☐ 11 Writ of Replevin | ☐ 26 Insurance/ Subrogation |
| ☐ 04 Condemnation (Emm Domain) | ☐ 12 Enforce Mechanics Lien |     Under $25,000 Consent Denied |
| ☐ 05 Ejectment | ☐ 16 Declaratory Judgment | ☐ 27 Insurance/ Subrogation |
| ☐ 07 Insurance/Subrogation | ☐ 17 Merit Personnel Act (OEA) |     Over $25,000 |
|     Under $25,000 Pltf |     (D.C. Code Title 1, Chapter 6) | ☐ 28 Motion to Confirm Arbitration |
|     Grants Consent | ☐ 18 Product Liability |     Award (Collection Cases Only) |
| ☐ 08 Quiet Title | ☐ 24 Application to Confirm, Modify, | ☐ 26 Merit Personnel Act (OHR) |
| ☐ 09 Special Writ/Warrants |     Vacate Arbitration Award | ☐ 30 Liens: Tax/ Water Consent Denied |
|     (DC Code § 11-941) |     (DC Code § 16-4401) | ☐ 31 Housing Code Regulations |

II.

| | | |
|---|---|---|
| ☐ 03 Change of Name | ☐ 15 Libel of Information | ☐ 21 Petition for Subpoena |
| ☐ 06 Foreign Judgment | ☐ 19 Enter Administrative Order as |     [Rule 28-I (b)] |
| ☐ 13 Correction of Birth Certificate |     Judgment [ D C. Code § | ☐ 22 Release Mechanics Lien |
| ☐ 14 Correction of Marriage |     2-1802 03 (h) or 32-1519 (a)] | ☐ 23 Rule 27(a) (1) |
|     Certificate | ☐ 20 Master Meter (D C. Code § |     (Perpetuate Testimony) |
| |     42-3301, et seq.) | ☐ 24 Petition for Structured Settlement |
| | | ☐ 25 Petition for Liquidation |

_____        9/4/2012
Attorney's Signature             Date

CV-496/Aug 12

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | |
|---|---|
| MAZDAK TAGHIOSKOUI, PH.D.<br>10 Monitor Court<br>Olney, MD 20832<br><br>       Plaintiff<br><br>v.<br><br>THE GEORGE WASHINGTON UNIVERSITY<br>2121 I Street, N.W.<br>Suite 250<br>Washington, D.C. 20052<br><br>      and<br><br>AKBAR MONTASER, PH.D.<br>11513 Karen Drive<br>Potomac, MD 20854<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

SEP 0 4 2012

Case No. 0007Ξ07-12

JURY TRIAL DEMANDED

### COMPLAINT AND JURY DEMAND

Plaintiff Mazdak Taghioskoui, Ph.D. ("Plaintiff" or "Dr. Taghioskoui"), by and through his attorneys, Bailey & Ehrenberg PLLC, brings this action against Defendants The George Washington University ("GWU") and Akbar Montaser, Ph.D. ("Dr. Montaser") (collectively the "Defendants"), and for his Complaint states as follows:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction and venue over the claims asserted herein by virtue of D.C. Code § 11-921(a)(6), and because the majority of the events that underlie this action and the injuries Plaintiff has sustained took place in the District of Columbia.

**PARTIES**

2.     Plaintiff is a 31-year old male who resides at the captioned address.

3.     Defendant GWU is a private educational institution with a principal place of business at 2121 I Street, N.W., Washington, D.C. 20052

4.     Defendant Dr. Montaser is an individual who resides at the above-captioned address, and was at all times relevant to this Complaint a Professor of Chemistry in the Department of Chemistry at GWU.

**FACTUAL BACKGROUND**

**Plaintiff is Induced to Attend GWU by Dr. Montaser's False Promises**

5.     Plaintiff received a Bachelor's Degree in Electrical Engineering at the Sharif University of Technology (Iran).

6.     Plaintiff was introduced to Dr. Montaser's research group by two of his friends and fellow Sharif University alumni. Plaintiff expressed his interest in pursuing a Ph.D. in Chemistry in the United States and possibly joining Dr. Montaser's research group at GWU.

7.     Dr. Montaser encouraged Plaintiff to apply to the Chemistry Ph.D. program at GWU, to the exclusion of all other programs.

8.     In the first of many manipulative actions, Dr. Montaser instructed Plaintiff not to apply to other Ph.D. programs in order to demonstrate that Plaintiff was determined to join Dr. Montaser's group. Dr. Montaser stated that he would not accept Plaintiff for the GWU program if Plaintiff applied to any other programs.

9.     Dr. Montaser told Plaintiff that he treated members of his research group like "family members" and wanted to ensure that Plaintiff would be "loyal" to him.

10.     In inducing Plaintiff to apply to the Ph.D. program at GWU, Dr. Montaser promised Plaintiff that he would receive full tuition and stipend support while attending GWU. Unbeknownst to Plaintiff, this was a false promise, as Dr. Montaser knew at the time there was no guaranteed funding for Plaintiff.

11.     As a result of Dr. Montaser's statements and promises, Plaintiff applied to the Chemistry Ph.D. program at GWU and did not apply to Ph.D. programs at any other schools.

### Plaintiff Enrolls at GWU

12.     Although he had applied for the Ph.D. program, Plaintiff received a letter of acceptance to GWU for admission to complete his Master's in Chemistry. The letter of acceptance further indicated that he would not receive any financial support.

13.     At that time, Dr. Montaser informed Plaintiff that he did not meet the minimum requirements for admission to the Ph.D. program because of his undergraduate GPA and degree, which was in engineering and not chemistry.

14.     With regard to the lack of financial support, Dr. Montaser stated that, prior to being offered financial support, Plaintiff would need to come to GWU in order to prove his abilities by performing well on a standard Chemistry placement exam required for all new students.

15.     Because Plaintiff had not applied to any other Ph.D. programs as a result of the instructions and false promises of Dr. Montaser, Plaintiff had no option but to accept his admission to the Chemistry Master's Program at GWU.

16.     Plaintiff enrolled in GWU's Chemistry Master's Program in the fall of 2005 as an international student.

3

17.     During the first week of his enrollment, Plaintiff took the placement exam and impressively ranked first amongst all other chemistry students who took the exam with Plaintiff.

18.     However, Dr. Montaser then told Plaintiff he would need to perform well in his first semester courses in order to receive the promised financial support.

19.     As a result, Plaintiff was required to pay his own tuition for the first semester of his enrollment.

20.     Moreover, despite obtaining an impressive 3.9 GPA during his first semester, Plaintiff continued to get the "run-around" from Dr. Montaser regarding his funding.

21.     During his second and third semesters in the spring and fall of 2006, Dr. Montaser finally provided partial tuition support to Plaintiff. However, Plaintiff was forced to obtain additional funding by working as a research assistant for three separate academic advisors.

22.     Despite a law permitting international students to work only twenty hours per week,  Dr. Montaser instructed Plaintiff to conduct additional research on weekends. Dr. Montaser stated that he was aware of the law, but told Plaintiff that it would not be a problem because Plaintiff was not being paid for the additional research hours.

23.     Dr. Montaser further indicated that Plaintiff needed to work more than twenty hours per week if Plaintiff wanted to receive financial support. Dr. Montaser referred to this as an "unspoken rule" for international graduate students.

24.     During the fall of 2005, Plaintiff became acquainted with Dr. Mona Zaghloul ("Dr. Zaghloul") upon enrolling in one of Dr. Zaghloul's Electrical Engineering courses. At that time, Plaintiff came up with an idea for a major research project that involved both Chemistry and Electrical Engineering principles (the "Micro-Plasma Project").

25.     Dr. Montaser instructed Plaintiff to draft a grant proposal for a GWU funding opportunity based on the Micro-Plasma Project so that Drs. Montaser and Zaghloul, jointly, could support Plaintiff's research. The grant proposal was eventually approved and Plaintiff finally gained financial support from GWU.

26.     Plaintiff fulfilled the requirements for his Master's degree in May 2007 and was finally admitted to the Ph.D. program in the Electrical and Computer Engineering Department in April 2007.

27.     During the spring of 2007, Plaintiff worked with minimal supervision on the Micro-Plasma Project with Drs. Montaser and Zaghloul. Plaintiff also prepared, at Dr. Montaser's request, additional grant proposals for various funding agencies such as NASA and NSF based on Plaintiff's research results.

### Dr. Montaser's Behavior Becomes Erratic and Unstable

28.     Unfortunately, Dr. Montaser proved an unstable and abusive academic advisor. Over the course of six years, Dr. Montaser actively inhibited Plaintiff's academic and professional progress by a series of actions which ranged from the bizarre to the malicious.

29.     Also during the spring of 2007, Plaintiff began to hear rumors from colleagues that Dr. Montaser had been diagnosed with cancer and would be leaving GWU. Plaintiff trusted that if such were the case, Dr. Montaser or the appropriate GWU official would contact Plaintiff so that he could adjust his academic plans accordingly.

30.     In the fall of 2007, Dr. Montaser informed his research group that he had been diagnosed with cancer, but that he was "cured" after "extensive treatment."

31.     Dr. Montaser stated that that the cancer had "changed his life in many ways" and exhibited increasingly bizarre and unstable behavior. He began referring to himself as a "fool," going as far as signing his emails as "Akbar, The Fool."

32.     As a result of the unstable conditions in Dr. Montaser's lab in the fall of 2007, Plaintiff transferred to GWU's Electric and Computer Engineering ("ECE") department for his Ph.D. Program.

33.     Plaintiff continued to work on the Micro-Plasma Project with Drs. Montaser and Zaghloul as his Ph.D. dissertation advisors, but continued to conduct the majority of his research in Dr. Montaser's lab in the Chemistry Department.

34.     During this time, Dr. Montaser's behavior became even more erratic and worrisome. Such behavior included, but was not limited to, bizarre, inappropriate emails to Plaintiff and other members of the GWU community; inaccurate and misleading statements about research and funding; referring to his research group as the "Tiger Club"; false information regarding a "plasma institute" that Dr. Montaser intended to start at GWU; fictitious claims regarding secret meetings with Department of Defense and Pentagon top personnel and Silicon Valley venture capitalists to fund the plasma institute; long and nonsensical emails and letters to Plaintiff assigning Plaintiff to perform tasks unrelated to the graduate program, such as designing logos and creating/editing resumes for potential future members of the plasma institute; insinuating that the Micro-Plasma Project research had been stolen from his lab by Plaintiff and Dr. Zaghloul; bizarre phone calls to Plaintiff on weekends and early mornings during which calls Dr. Montaser used extremely inappropriate and demeaning language; sending false and demeaning emails about Plaintiff to various GWU faculty members; claims of "novel ideas" that were coming to Dr. Montaser's mind "every five seconds"; and falsely informing Plaintiff that

his research article had been accepted as a cover page article, despite the fact that the article would eventually be rejected.

35.     In 2008, Plaintiff asked for permission to include a photograph of the device he made as a result of joint efforts by both the GWU Electrical Engineering and Chemistry departments on Dr. Zaghloul's website. Dr. Montaser claimed that Plaintiff had no right to do so and disturbingly stated:

> I will not tolerate in any time such oversights, and irrespective of your high productivity in recent months that I am exceptionally proud. Any such oversights smell awful, and is total deception. I swear to anything precious that you or I accept, **I will not allow your graduation here**, elsewhere, irrespective of the corner of the globe....

36.     Following a presentation given by Plaintiff at a departmental event in 2008, Dr. Montaser called Plaintiff, using curse words and other abusive language, complaining that Plaintiff's departmental affiliation was given on the presentation as the "Department of Electrical Engineering" (where Plaintiff was officially enrolled in at the time), and not the "Department of Chemistry." Dr. Montaser sent an email to Plaintiff and copied numerous faculty members stating: "...I will not approach such individuals with a ten-foot pole in my community, let alone assisting one to become a big snake to bite others....I train PhD students as a human being first, not as Thieves with Light!..."

37.     In another incident, Plaintiff received a prestigious award for his work on the Micro-Plasma Project and shared the news with Dr. Montaser. In response, Dr. Montaser sent an email, copying many GWU faculty members, alleging that the award was based on deceit:

> You do know me; I am known to break legs if anyone crosses the fundamental principles in life or in profession . . . . You may have all invention in the world, yet it is based on DECEIT, and you know no Professor, especially this one, would stand for it.

38.     Dr. Montaser later admitted to Plaintiff that he had made a mistake, but refused to send a public apology to those copied faculty members who had received the defamatory email. Rather, Dr. Montaser sent another false and defamatory email alleging that Plaintiff did not have a "fundamental understanding" of the subject and that Plaintiff "mixed friendship with authorship."

39.     In an effort to justify his erratic behavior, Dr. Montaser ordered another graduate student (who had been helping Plaintiff with the Micro-Plasma Project) to send Dr. Montaser a confidential email highlighting his own contribution to the Micro-Plasma Project. Per instructions, this student wrote an email to Dr. Montaser, but shared the email with Plaintiff because he believed the award should be awarded solely to Plaintiff as the major contributor and inventor.

40.     In another incident, Plaintiff requested a recommendation letter from Dr. Montaser and asked him to share a copy with Plaintiff before submission.  When Dr. Montaser shared a copy with Plaintiff, Plaintiff found out that, in the recommendation letter, Dr. Montaser had described his own problems with GWU in elaborate detail rather than recommending Plaintiff for the position.

### Dr. Montaser Makes Unreasonable Demands of Plaintiff

41.     Dr. Montaser also asked Plaintiff repeatedly for favors unrelated to Plaintiff's graduate program. Examples include but are not limited to: requesting Plaintiff's wife's assistance to find a job for Dr. Montaser's friend; borrowing money from Plaintiff; borrowing Plaintiff's car for personal use; having Plaintiff draw schematics of the front yard of Dr. Montaser's residence for landscaping; having Plaintiff install Dr. Montaser's new TV after he invited Plaintiff to his house to work on a research proposal; having Plaintiff make him a website

and updating the website with his personal information such as Dr. Montaser's poetry; having Plaintiff prepare power point presentation slides not related to Plaintiff's graduate program; having Plaintiff prepare resumes for third parties on several occasions; having Plaintiff search online for music videos for Dr. Montaser; and having Plaintiff design a custom made T-shirt with a "Chef Akbar, Akbar's Café" logo on it.

42.     At the same time, Dr. Montaser's productivity and ability to supervise Plaintiff became greatly reduced. On several occasions, Dr. Montaser requested meetings with Plaintiff and Dr. Zaghloul but then spent the entire meeting discussing unrelated matters.

43.     Dr. Montaser's unreasonable requests from Plaintiff to work on grant proposals adversely affected Plaintiff's academic and personal life.

44.     On several occasions, Dr. Montaser accused Plaintiff of deceit and abused his professional authority by using his students, including Plaintiff, as pawns in his eventual conflict with GWU. Dr. Montaser's conduct caused Plaintiff to suffer such mental anguish that Plaintiff became suicidal. At one point, Plaintiff contacted GWU's suicide hotline.

45.     The situation continued to deteriorate through the spring and into the summer of 2008. After a few unhelpful appointments with GWU's student health services, Plaintiff decided to depart from his studies at GWU during the summer of 2008 in order to seek relief and visit his family in Iran. In doing so, Plaintiff risked not being able to return to the U.S. to complete his studies at GWU, as his visa was a single-entry visa and he would be required to undertake a rigorous visa procedure to return.

46.     Due to the extreme stress and pressure, Plaintiff had become extremely depressed, was experiencing insomnia, and had lost a significant amount of weight. Plaintiff's mental and physical state were so deteriorated that Plaintiff's father accused Plaintiff of being a drug addict

and insisted that Plaintiff submit to a drug test. Only when the drug test came back negative did Plaintiff's father believe that his son's state was indeed due to the stress resulting from his experiences with GWU and Dr. Montaser. Plaintiff's father asked Plaintiff to return home each summer, despite the burdensome visa process, so that he could ensure his son's health did not deteriorate further.

47.     Other graduate students in Dr. Montaser's research group were under similar pressure and stress to the extent that their parents felt the urge to contact Dr. Montaser inquiring about the difficulties that their children were experiencing in Dr. Montaser's research group.

### Dr. Montaser is Placed on Administrative Leave (Spring 2008)

48.     Dr. Montaser's bizarre and unstable actions continued to escalate through the spring of 2008. By this time, the Chair, faculty members, and the Dean of CCAS were aware that Dr. Montaser's erratic behavior was harming Plaintiff and Dr. Montaser's other graduate students.

49.     After an incident in which Dr. Montaser threatened to punch the Executive Vice President of GWU in the face, he was placed on administrative leave beginning in April 2008 through January 2010.

50.     The reasons for the administrative leave, as stated by GWU, were Dr. Montaser's "continuing and increasingly disruptive, threatening and aberrant conduct and behavior toward members of the University community, including faculty, academic administrators, and staff." GWU further informed Dr. Montaser that:

> Other and related reported concerns include student complaints of your devoting significant amounts of time discussing issues unrelated to course content, concerns about pressure placed on students to advocate on your behalf, use of University resources to advocate on behalf of political candidates; reported arbitrary and capricious grading; and concerns about your communications with

external agencies and others with respect to proposed grants, contracts and academic programs.

51.     GWU instructed Dr. Montaser to seek an evaluation from a qualified doctor.

52.     However, GWU failed to apprise Dr. Montaser's graduate students, including Plaintiff, of the situation, and failed to provide any guidance. Plaintiff received updates about Dr. Montaser's situation through rumors, rather than from GWU officials. Plaintiff was being informed of incidences via long and erratic emails sent by Dr. Montaser on which Plaintiff was blind copied for no apparent reason.

53.     Dr. Montaser's bizarre conduct and unreasonable demands of Plaintiff continued throughout his administrative leave.

54.     For example, while on administrative leave from GWU, Dr. Montaser asked Plaintiff to intentionally damage an instrument purchased with University Facilitating Funding of GWU (an optical emission spectrometer, HR 4000, Oceanoptics) as a retaliatory act against GWU for Dr. Montaser's removal. Plaintiff refused to do so.

55.     Dr. Montaser and his wife contacted Plaintiff numerous times during his administrative leave. Dr. Montaser's wife often called Plaintiff requesting explanations for Dr. Montaser's personal problems and erratic interaction with his family. In one instance, Dr. Montaser's wife informed Plaintiff that Dr. Montaser held the deluded belief that she intended to poison him and that Dr. Montaser had raised the issue with their family friends. On another occasion, Dr. Montaser's wife requested that Plaintiff speak with GWU officials to persuade them to allow Dr. Montaser to return to his duties at GWU. Plaintiff stated that he could not do so and was not in a position to make such a request of GWU. Plaintiff asked Dr. Montaser's wife to contact the police or Dr. Montaser's physician to discuss such issues, rather than contacting Plaintiff.

11

**GWU Prevents Plaintiff from Continuing His Research (2008-2009 academic year)**

56.     In the fall of 2008, while Dr. Montaser was on administrative leave, the Chair of the Chemistry Department asked Plaintiff to return his keys to Dr. Montaser's laboratory.

57.     Plaintiff requested that his experimental setup be transferred to another location, but his request was denied. This caused severe delays in Plaintiff's academic progress and productivity.

58.     Plaintiff expressed concern regarding his research because the experimental setup for the Micro-Plasma Project was in Dr. Montaser's research laboratory. In response, the Chemistry Chair and Dr. Zaghloul informed Plaintiff that, because of the conflicts taking place between Dr. Montaser and GWU, Dr. Montaser's research laboratory would be locked and could not be accessed.

59.     When Plaintiff informed Dr. Zaghloul of the delays, she encouraged Plaintiff to wait for action by GWU to resolve the situation so that Plaintiff could regain access to his experimental setup and continue the Micro-Plasma Project.

60.     In the spring of 2009, still unable to access his experimental setup for the Micro-Plasma Project, Plaintiff determined that he would have to be productive independently. Plaintiff published and was the sole author of an article for a prestigious scientific journal.

61.     Plaintiff again reached out to Dr. Zaghloul regarding continuing his research on the Micro-Plasma Project and accessing his experimental setup in Dr. Montaser's lab. In response, Plaintiff was informed that Dr. Zaghloul would first have to receive permission from GWU's attorneys for Plaintiff to do so. Plaintiff remained barred from his experimental setup for the Micro-Plasma Project throughout the spring of 2009.

62.     Distraught as a result of the extreme stress he was under and the lack of access to his experimental setup for the Micro-Plasma Project, combined with the lack of financial support from GWU, Plaintiff again returned to his home country during the summer of 2009.

63.     During that visit, Dr. Montaser made a number of harassing phone calls to Plaintiff and Plaintiff's family members.

### Plaintiff Begins Work on the Magnetic Loop Device (2009-2010 academic year)

64.     In the fall of 2009, Plaintiff returned to GWU to continue his efforts towards his Ph.D. and to regain access to his experimental setup and continue his research on the Micro-Plasma Project.

65.     Finally, in September 2009, Plaintiff received approval to transfer a single piece of equipment (which had been purchased with funds secured by the 2007 joint grant for the Micro-Plasma Project) from Dr. Montaser's laboratory to Dr. Zaghloul's laboratory.

66.     However, Plaintiff was forbidden to continue his original work on the Micro-Plasma Project due to GWU's professed uncertainties about the intellectual property and legal aspects of the project. Thus, Plaintiff began work on a new idea and invented a new device for generating atmospheric pressure micro plasmas (the "Magnetic Loop Device").

67.     Plaintiff shared the information with Dr. Zaghloul, completed the research, wrote a manuscript on the subject, and submitted it to the Applied Physics Letter on November 18, 2009. Dr. Montaser was not listed as a co-author of the article since he had been absent from GWU during Plaintiff's work on the Magnetic Loop Device and had not been involved in its invention.

68.     The submitted manuscript was accepted for publication with minor revisions on February 23, 2010.

13

### Dr. Montaser Returns to GWU (Winter 2010)

69.     In January 2010, Dr. Zaghloul informed Plaintiff that Dr. Montaser would be returning from administrative leave. Plaintiff was given back his keys to Dr. Montaser's lab.

70.     At that time, Dr. Zaghloul and Plaintiff added Dr. Montaser as a co-author to the article on the Magnetic Loop Device in an effort to be understanding, to successfully continue their joint research, and to assist Dr. Montaser in re-establishing his standing at GWU.

71.     Upon Dr. Montaser's return to GWU from his administrative leave, Plaintiff was his only graduate student.

72.     Given that GWU had permitted Dr. Montaser to return to GWU, Plaintiff believed Dr. Montaser's behavioral issues had been resolved. Plaintiff trusted that GWU had properly evaluated Dr. Montaser to assure that he would no longer abuse his authority or his students. Plaintiff also assumed that, given Dr. Montaser's prior actions, GWU would take steps to adequately supervise Dr. Montaser upon his return to GWU.

73.     Plaintiff was informed by Dr. King that Dr. Montaser's return was probationary and that any concerns should be brought to Dr. King's attention immediately. Additionally, Dr. King informed Plaintiff that, in addition to GWU, Dr. Montaser's wife also would be supervising Dr. Montaser to ensure that his conduct was appropriate. During the first several months of Dr. Montaser's return to GWU, Dr. Montaser's wife was almost always present when Plaintiff visited Dr. Montaser's office.

74.     During the spring of 2010, Plaintiff re-started the Micro-Plasma Project with Drs. Montaser and Zaghloul as his academic supervisors.

14

75.     Plaintiff also prepared a grant proposal regarding the Magnetic Loop Device which was submitted by Drs. Montaser and Zaghloul for a GWU funding opportunity. The grant was awarded in the summer of 2010.

76.     During the summer and fall of 2010, Plaintiff continued his work on the Magnetic Loop Device and prepared the results of his experimentation for submission to a professional conference set to take place in the fall of 2010.

77.     However, Dr. Montaser refused to allow the Plaintiff to attend the conference to present his research. Plaintiff was given inconsistent reasons for this by Drs. Montaser and Zaghloul. Dr. Montaser claimed that Dean Korman had refused to allow Plaintiff to attend; however, Dean Korman later denied ever having spoken to Dr. Montaser about the conference.

78.     During the summer of 2010, Plaintiff produced two separate manuscripts to be submitted for publication. The first article was about his experimental research on the application of the Micro-Plasma Project in the Martian atmosphere (the "Mars Project"). The Mars Project eventually resulted in the "Mars Paper," which Plaintiff drafted for review by Drs. Montaser and Zaghloul in August 2010. Second, Plaintiff further developed the Magnetic Loop Device in preparation for a second manuscript (the "Tongue-Shaped Plasma Paper").

### Dr. Montaser's Erratic and Manipulative Behavior Worsens (2010-2011)

79.     Despite Dr. Montaser's extended leave of absence, his bizarre, manipulative, and abusive behavior towards the Plaintiff continued and even escalated upon his return to GWU. Sadly, Dr. Monster's actions went unsupervised by GWU.

80.     In March 2011, Plaintiff submitted the Mars Paper to the journal Analyst. Plaintiff listed himself and Drs. Zaghloul and Montaser as co-authors. Drs. Zaghloul and Montaser approved submission of the Mars Paper to a "reputable journal."

15

81.     In May 2011, <u>Analyst</u> informed Plaintiff that the MARS paper was accepted for publication subject to minor proposed revisions. Plaintiff resubmitted the paper in June 2011, and it was accepted for publication in its then-current form.

82.     In early July 2011, Dr. Montaser contacted <u>Analyst</u> without Plaintiff's knowledge and retracted the Mars Paper, stating that it would be resubmitted after corrections had been made.

83.     Dr. Montaser offered no valid explanation to Plaintiff for retracting the Mars Paper.

### Dr. Montaser Interferes with Patent Applications

84.     During Plaintiff's tenure at GWU, Dr. Montaser actively worked to inhibit Plaintiff's work on two inventions which Plaintiff intended to patent. His actions ranged from the academically dishonest to outright theft of the Plaintiff's intellectual property.

85.     Plaintiff informed GWU of Dr. Montaser's unscrupulous actions and followed written GWU protocol in filing official complaints with GWU's Office of Research.

86.     Despite Plaintiff's requests that GWU investigate and resolve these disputes, GWU has repeatedly refused to do so, leaving Plaintiff to suffer harm to both his academic reputation and his business prospects.

a)      **Artificial Smoke Cigarette, US Patent 7,845,359, 2010, and related patents:**

87.     During the fall of 2006, Plaintiff informed Dr. Montaser that Plaintiff had come up with a design for a device to help him quit smoking: a fog-generating electronic cigarette (the "Artificial Smoke Cigarette").

88.     Later in the fall of 2006, Dr. Montaser asked Plaintiff to draw the schematics for the Artificial Smoke Cigarette and asked another GWU graduate student, Ryan Brennan ("Dr.

16

Brennan"), to perform a literature search on the topic. Plaintiff provided Dr. Montaser with several designs for the Artificial Smoke Cigarette.

89.   Plaintiff and Dr. Brennan worked on the project with the support of GWU and used GWU facilities in their work. Accordingly, any resulting patent application should have been processed through GWU's Office of Research/Office of Technology Transfer.

90.   Dr. Montaser told Plaintiff that they would file for a patent and start a company together.

91.   Dr. Montaser did not ask Plaintiff to file a patent application through GWU for the Artificial Smoke Cigarette.

92.   Plaintiff believed that the project had been shelved by Dr. Montaser's extended leave of absence.

93.   Plaintiff discovered in February 2010 that Dr. Montaser had, without Plaintiff's consent or knowledge, filed a patent application for the Artificial Smoke Cigarette. The patent application, which was filed on March 22, 2007, used several of Plaintiff's original drawings, but named Dr. Montaser as the sole inventor. Moreover, the invention had not been disclosed through GWU's standard invention disclosure process.

94.   Plaintiff contacted, in turn, the Office of The Senior Vice President and General Counsel of GWU, Dean Korman, and Dean Dolling to discuss ownership of the patent,

95.   Each time, Plaintiff was directed to yet another entity who failed to take action.

96.   Plaintiff ultimately filed an official complaint with GWU's Office of Research.

97.   Plaintiff was unable to obtain a response to his efforts to follow up with the various entities, including his official complaint with the Office of Research.

17

98.     To date, GWU has taken no action with regard to the Artificial Smoke Cigarette patent.

99.     Upon information and belief, Dr. Montaser has sold the Artificial Smoke Cigarette patent.

**b)      The Magnetic Loop Device; US Provi. Ser. No. 61/485,469:**

100.     Shortly after publication of the "Magnetic Loop Device" manuscript on July 8, 2010, Plaintiff sent an email to Drs. Zaghloul and Montaser, attaching the completed "Invention Disclosure Form" of GWU along with a patent search to be submitted to GWU's Office of Research. Neither Dr. Zaghloul nor Dr. Montaser took any action.

101.     Plaintiff reminded his advisors several times via email and during in-person meetings to take action on filing the patent application. Dr. Montaser did not respond to the emails and gave several excuses during in-person meetings.

102.     After seven months, on May 3, 2011, Plaintiff received an email from Dr. Zaghloul regarding filing a patent application for the Magnetic Loop Device.

103.     Prior to filing, Plaintiff shared with Dr. Zaghloul his concern that Dr. Montaser should not be listed as an inventor on the application since had been absent from GWU when Plaintiff came up with the idea, finished the research, and sent the manuscript for publication.

104.     Dr. Zaghloul agreed that Dr. Montaser did not have enough contributions to be listed as a co-inventor, but instructed Plaintiff that it was better to include Dr. Montaser to avoid conflict, given that Plaintiff was still dependent on Dr. Montaser in order to receive his Ph.D.

105.     Dr. Zaghloul promised Plaintiff that the inventors would be listed in the following order: (1) Mazdak Taghioskoui; (2) Mona Zaghloul; and (3) Akbar Montaser. Plaintiff signed off on a patent application listing the inventors in that order.

18

106.     For unknown reasons, Dr. Montaser delayed submitting the disclosure of this invention to GWU for almost a year, supposedly because the invention was not strong and needed more data. This was nothing more than a delaying tactic, as the manuscript had already been published in the Applied Physics Letter.

107.     During the process of preparing the patent application, Dr. Montaser excluded Plaintiff from his correspondence with GWU's intellectual property lawyers. Dr. Montaser added vague and non-scientific claims (which were incorrect) to the patent that were not correct.

108.     Plaintiff asked Dr. Montaser to communicate with him before adding any material to the patent application. Dr. Montaser did not respond.

109.     On May 11, 2011, Plaintiff informed Dr. Charanjeet Guron, Associate Director of GWU's Office of Technology Transfer, that he had not received a copy of the patent application.

110.     On May 12, 2011, a Provisional Patent Application was filed with the U.S. Patent and Trade Office. Despite the previously agreed upon order of inventors, Dr. Montaser's name was listed first on the U.S. Provisional Application.

111.     On June 3, 2011, Plaintiff and Dr. Zaghloul received a copy of the filed Provisional Application from GWU's Intellectual Property Manager, Susan S. Allen. At that time, Plaintiff and Dr. Zaghloul became aware that Dr. Montaser's name was listed as the first inventor.

112.     Dr. Zaghloul informed Ms. Allen of her concerns regarding the list of inventors' names, and requested that the application be withdrawn and corrected. Ms. Allen (falsely) informed Plaintiff and Dr. Zaghloul that it was not possible to withdraw the U.S. Provisional Application or to re-file an identical U.S. Provisional Application with a revised sequence or list of inventors.

19

113.    In July 2011, the Office of Technology Transfer invited Plaintiff, Dr. Zaghloul and Dr. Montaser to a meeting to discuss their respective intellectual contributions to the Magnetic Loop Device. Dr. Zaghloul and Plaintiff attended the meeting, but Dr. Montaser did not.

114.    Dr. Montaser was then provided an opportunity to respond in writing and provide evidence of his claims of inventorship. Dr. Montaser did not provide any information.

115.    GWU has made no further attempts to resolve this issue.

116.    Plaintiff has suffered damage to his academic and professional reputation by not being listed as the first inventor on the patent for the Magnetic Loop Device.

117.    On information and belief, Dr. Montaser has also secretly attempted to sell the invention and has disclosed it to several companies.

118.    As a result, Plaintiff has also suffered the loss of economic and business opportunities.

### Dr. Montaser Intentionally Interferes with Plaintiff's
### Research Process and Graduation (2010-2011)

119.    Dr. Montaser's attempts to keep Plaintiff from graduating continued throughout 2010 and 2011.

120.    Although Plaintiff informed multiple GWU faculty and administrators of Dr. Montaser's inappropriate and tortious behavior on numerous occasions over the course of several years, GWU did nothing to intervene and GWU continued to fail to properly supervise Dr. Montaser.

121.    Dr. Montaser took actions such as: "moving the ball" by articulating ever more elaborate requirements for Plaintiff to obtain his Ph.D.; interposing needless delays and requiring

needless revisions to Plaintiff's academic publications; stealing Plaintiff's work and presenting it as his own; defaming Plaintiff; and making outright threats to Plaintiff.

122.   Dr. Montaser was motivated by professional jealousy and/or the desire to keep Plaintiff under his control in order to pass off Plaintiff's work off as his own.

123.   During the summer of 2010, Plaintiff defended and passed his Doctoral qualifying examination in front of his dissertation committee, which included Dr. Montaser, Dr. Zaghloul, Dean Korman, and a faculty member from the ECE Department.

124.   Throughout the summer and fall of 2010, Plaintiff, on numerous occasions, requested that his academic advisors provide him with a written list of further required tasks for graduation. However, despite his verbal and written requests to his advisors, Plaintiff was never provided with a written, accurate, clear, or consolidated list of required tasks for graduation.

125.   Dr. Montaser purposefully avoided written communication via email regarding academic guidance and requirements, communicating mostly via verbal conversations, despite Plaintiff's requests that communications be in writing.

126.   Dr. Montaser would later deny or change his previous statements regarding Plaintiff's graduation requirements, manuscript reviews, purchase requests, instrument repairs, meeting follow-ups, and recommendation letter submissions. This further delayed Plaintiff's graduation and impeded Plaintiff's ability to publish his research.

127.   Dr. Montaser caused many needless delays in Plaintiff's academic progress. For example, Dr. Montaser ignored Plaintiff's repeated requests that he review the Mars Paper for submission for publication (which was Dr. Montaser's academic responsibility as Plaintiff's academic advisor), and instead arbitrarily requested that Plaintiff obtain additional research results.

128.    In one email, Dr. Montaser stated that Plaintiff would be required to have five to twenty publications in order to defend his dissertation, even though the ECE Department guidelines required only one publication for graduation.

129.    In several emails copied to the members of Plaintiff's dissertation committee, Dr. Montaser (incorrectly) stated that Plaintiff's two pending publications were required for Plaintiff to be able to defend his dissertation.

130.    At that time, Plaintiff already had three journal publications and two pending journal publications.

131.    In December 2010 at a meeting held in response to Plaintiff's repeated request for a clear research plan, Drs. Montaser and Zaghloul informed Plaintiff that a written research plan was "not required" and that Plaintiff needed to focus his efforts on his research results. Moreover, despite previously having assured Plaintiff that he would be able to defend his dissertation in February 2011, Dr. Zaghloul unexpectedly rejected Plaintiff's request to sign his graduation paperwork at the meeting.

132.    Plaintiff then met with Dean Korman, at which meeting Plaintiff presented his research results and accomplishments and brought up the fact that he had already completed the coursework and research credit hours required for graduation. Dean Korman said that, given the amount of work Plaintiff had completed, Plaintiff should be allowed to defend his dissertation and graduate. Dean Korman advised Plaintiff to copy the other members of his dissertation committee on Plaintiff's written communications with his academic advisors in order to "keep the ball moving" on his graduation process.

133.    Plaintiff also informed Dean Korman: (1) of his belief that Dr. Montaser's attempts to delay Plaintiff's graduation were related to his desire to prove himself productive

upon his return to GWU by retaining Plaintiff for his own benefit; and (2) that Dr. Zaghloul's lack of knowledge with regard to Plaintiff's area of research rendered her unable to adequately supervise Plaintiff's study. Plaintiff requested that his dissertation committee and/or other faculty members review the situation in order to provide him with guidance on the steps necessary to complete his Ph.D and graduate.

134.    Plaintiff also requested a meeting with Dr. King to inform him of Dr. Montaser's peculiar behavior. Despite the fact that Plaintiff remained under the control of Dr. Montaser, Dr. King told Plaintiff to follow up on the matter through the Engineering school as he was no longer enrolled in the Chemistry program.

135.    In the spring of 2011, frustrated by endless delays and inconsistent information regarding his graduation, Plaintiff resolved to switch his academic advisor and begin his research from scratch despite the six years of effort he had already put forth. Plaintiff consulted Dean Korman and asked whether Dean Korman would agree to serve as his academic advisor. Dean Korman stated that he would be more than happy to do so, but requested that Plaintiff first inform Drs. Montaser and Zaghloul of his decision to change academic advisors.

136.    Plaintiff sent an email informing Drs. Montaser and Zaghloul of his decision. In response, Dr. Zaghloul asked Plaintiff to return all devices that he had made or was working on to her office. Plaintiff immediately returned all the devices to Dr. Zaghloul.

137.    Dr. Zaghloul then told Plaintiff that Dean Korman would not agree to serve as his academic advisor and the Plaintiff should leave GWU if he wanted to switch his academic advisor.

138.   Although he had previously agreed to serve as Plaintiff's academic advisor, Dean Korman later informed Plaintiff that he first needed to check with Dr. Zaghloul before deciding whether or not he would be willing to serve as Plaintiff's academic advisor.

139.   Dean Korman then informed Plaintiff that he wanted to set up a meeting with Plaintiff's dissertation committee members to discuss the issues related to Plaintiff's problems with his academic advisors.

140.   The dissertation committee meeting took place on February 2, 2011. At the meeting, Plaintiff's academic performance was ridiculed several times by his academic advisors. Dr. Montaser insisted that Plaintiff's academic language skills were not well developed because English was not Plaintiff's first language, and that the structure of Plaintiff's papers required extensive revision. When Plaintiff brought up his published solely-authored paper, Drs. Montaser and Zaghloul mocked the paper in front of the other dissertation committee members. Dr. Montaser stated that, due to his being a foreign national, Plaintiff's language skills were unsatisfactory and Plaintiff would not be able to succeed in life.

141.   Humiliated, Plaintiff stated to Dean Korman that, clearly, his academic advisors did not hold the best intentions for him. Plaintiff again requested that he be allowed to change academic advisors. In response, Dean Korman encouraged Plaintiff to comply with the requests of his current academic advisors in order to proceed with his work.

142.   At the conclusion of the meeting, Plaintiff was given a written research plan stating that, if Plaintiff decided to change his academic advisor, he would receive only a terminal Master's degree from GWU (instead of a Ph.D.) and that no further support would be provided by GWU.

143.    Plaintiff scheduled a meeting with a writing coach at GWU's language center in response to Dr. Montaser's accusations. The writing coach reviewed Plaintiff's paper and stated that "a brief review of the paper revealed no large grammatical or other language errors" and that "the readability of the paper in my opinion is satisfactory."

144.    When the writing coach's opinion was brought to the attention of Dr. Montaser, Dr. Montaser instructed Plaintiff to provide detailed information from the writing coach. Fearing that Dr. Montaser intended to contact the writing coach in an attempt to further sabotage his paper, Plaintiff asked Dr. Montaser why he needed the information. Dr. Montaser did not respond.

### Plaintiff is Forced to Obtain Legal Counsel (2011)

145.    Due to GWU's continued failure to properly supervise Dr. Montaser and GWU's failure to allow Plaintiff to stand for his dissertation, Plaintiff was forced to retain legal counsel in the spring of 2011.

146.    In July 2011 Plaintiff requested, through his counsel, a meeting with representatives of GWU to address his situation. Plaintiff and his counsel subsequently met with Dr. C. Dianne Martin, GWU's Vice Provost for Faculty Affairs, and several individuals from GWU's Office of the Senior Vice President and General Counsel.

147.    On July 28, 2011, and only after Plaintiff had been forced to retain counsel, GWU finally removed Dr. Montaser from Plaintiff's dissertation committee.

148.    Only after Dr. Montaser was removed from Plaintiff's dissertation committee was Plaintiff finally permitted to defend his dissertation, which he did successfully on September 20, 2011.

### Dr. Montaser's Attempts to Smear Plaintiff's Academic Reputation

149.    Even after Dr. Montaser was removed from Plaintiff's dissertation committee in 2011, he sought out ways to cause harm to Plaintiff.

150.    For example, on August 16, 2011, Dr. Martin shared with Plaintiff an "anonymous" review of the Plaintiff's work presented to him by Dr. Montaser. Upon investigation, Plaintiff learned that it was a fake review written by Dr. Montaser which contained vague and non-substantive critiques of Plaintiff and laudatory comments about Dr. Montaser as a person.

151.    In September 2011, Dr. Montaser set up an appointment under false pretenses with Plaintiff's post-doctoral supervisor at Georgetown University, and then spent the entire meeting defaming and smearing Plaintiff and his professional abilities in an effort to dissuade the post-doctoral advisor him from hiring Plaintiff.

152.    Dr. Martin later verified Dr. Montaser's retaliatory act by contacting Plaintiff's post-doc advisor.

### Dr. Montaser Plagiarizes Plaintiff's Work

153.    Based on his work on the Magnetic Loop Device, Plaintiff prepared the Tongue-Shaped Plasma Paper for submission to the Institute of Electronics Engineers' ("IEEE") Transactions on Plasma Sciences journal in 2010.

154.    Plaintiff initially listed both Drs. Montaser and Zaghloul as co-authors on the Tongue-Shaped Plasma Paper, but later requested that Dr. Montaser's name be removed because he had not made any scientific contributions to the manuscript. Dr. Montaser refused to agree to the removal of his name.

155.    Because of Dr. Montaser's refusal to agree to have his name removed, the Tongue-Shaped Plasma Paper was never submitted for publication.

156.    On July 27, 2011, Dr. Montaser submitted a grant proposal to the Naval Surface Warfare Research Center for research grant funding (the "NSWRC Research Grant Proposal").

157.    Dr. Montaser's abstract and full technical proposal for the NSWRC Research Grant were nearly identical to the unpublished abstract and manuscript of Plaintiff's unpublished Tongue-Shaped Plasma Paper with minor changes.    The grant abstract described a device invented solely by Plaintiff and the proposal contained research and results gained by Plaintiff's use of that device during the preparation of his thesis in the Engineering department, without any contribution from Dr. Montaser.

158.    The NSWRC Research Grant Proposal listed Dr. Montaser as the sole principal investigator and made no mention of Plaintiff.    Dr. Montaser did not receive permission from either Plaintiff or Dr. Zaghloul to submit this grant proposal.

159.    On August 2, 2011, Plaintiff informed GWU administrators that Dr. Montaser had plagiarized his Tongue-Shaped Plasma paper and reported it as research misconduct. Plaintiff requested that GWU investigate the issue before allowing Dr. Montaser to submit the proposal.

160.    Later, Plaintiff found out that the Office of the Vice President for Research had actually approved submission of the proposal.

161.    GWU did not take any actions. On June 6, 2012, in response to the Plaintiff's several requests to investigate and stop the stolen research that were submitted as a proposal, GWU simply informed the Plaintiff that "in case you do not know, the Naval Surface Warfare proposal submitted by Professor Montaser was rejected." GWU did not take any action to stop Dr. Montaser's behaviors prior to this time.

27

**Dr. Montaser Presents Material from Plaintiff's Dissertation Without Authorization**

162.     In the winter of 2011, Plaintiff became aware that Dr. Montaser was scheduled to present at the 2012 Winter Conference on Plasma Spectrochemistry in Tuscon, Arizona (the "Winter Conference") Plaintiff's research, without Plaintiff's permission or knowledge, and without mention of Plaintiff or Dr. Zaghloul as co-authors.

163.     On December 1, 2011, Plaintiff filed an official complaint with regards to Dr. Montaser presenting materials from his dissertation at the Winter Conference with the Office of the Vice President for Research. Plaintiff did not receive any response.

164.     On January 8, 2012, Plaintiff provided GWU with documents, including (1) a copy of the preliminary program for the 2012 Winter Conference on Plasma Spectrochemistry which listed Dr. Montaser as presenting "New Devices for Formation and Operation of Mini and Micro Plasmas" on Thursday, January 12, 2012; (2) an announcement for Dr. Montaser's seminar on "Fieldable Labs on Earth and in Space," at which seminar Dr. Montaser presented Plaintiff's research without mention of Plaintiff; (3) an email from Dr. Montaser refusing to provide a written research plan for Plaintiff's graduation; (4) an email from the GWU writing coach stating that the English of Plaintiff's Analyst paper was satisfactory; (5) a series of communications between Plaintiff and Dr. Montaser in which Dr. Montaser admitted he had sufficient time to provide revisions with regard to Plaintiff's Analyst paper (but did not); (6) documents related to Plaintiff's Tongue-Shaped Plasma Paper, including a revised manuscript, demonstrating that Dr. Montaser's revisions only addressed the paper's English structure; (7) documents related to the Artificial Smoke Cigarette patent; (8) documents related to the Magnetic Loop Device patent; and (9) documentation of Dr. Montaser contacting Plaintiff's future post-graduate advisor at Georgetown University in an attempt to dissuade him from hiring

Plaintiff. Plaintiff specifically requested that GWU prevent Dr. Montaser from presenting his research at the conference.

165.    Despite Plaintiff's notifications and requests, GWU did nothing to prevent Dr. Montaser from presenting Plaintiff's research at the Winter Conference.

166.    Dr. Montaser ultimately did present "New Devices for Formation and Operation of Mini- and Micro Plasmas" on Thursday, January 12, 2012, at the Winter Conference.   Dr. Montaser did not mention Plaintiff or Professor Zaghloul in his presentation.

167.    On February 9, 2012, Plaintiff informed GWU that Dr. Montaser had indeed presented material taken from Plaintiff's dissertation at the Winter Conference.

168.    In response, Dr. Martin requested that Plaintiff "provide any evidence you may have about the content of what [Dr.] Montaser presented and why you believe it was wrongful." Plaintiff provided an explanation. Plaintiff did not receive a response from Dr. Martin (or from anyone else at GWU).

169.    On April 6, 2012, GWU, in response to a request by Plaintiff that GWU investigate the validity of the review provided by Dr. Montaser, asked Plaintiff to "keep in mind . . . [that] a charge of serious misconduct that is not well founded may itself constitute an act of misconduct."

170.    On April 29, 2012 Plaintiff informed GWU that (i) Dr. Montaser had induced Plaintiff to come to GWU with false promises of financial support; (ii) Dr. Montaser made promises of financial assistance in an attempt to "catch" another prospective graduate student in 2007, and had asked his graduate students to encourage the prospective graduate student to accept the offer; and (iii) Dr. Montaser had made false promises of financial support to a third prospective graduate student. Plaintiff requested that GWU take timely action to prevent Dr.

Montaser from luring more prospective graduate students with false promises of financial support.

171.    To date, GWU has failed to take any action against Dr. Montaser, despite clear evidence of Dr. Montaser's wrongdoing and repeated violations of GWU's own policies. GWU has taken no action against Dr. Montaser for his actions vis-à-vis Plaintiff. Nor has GWU found any violations by Dr. Montaser of its own academic and research policies.

**COUNT I**
**(Breach of Fiduciary Duty Asserted Against Both Defendants)**

172.    Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 171 as though fully set forth herein.

173.    At all times relevant hereto, GWU and Dr. Montaser were in positions of power and authority over Plaintiff. At all times relevant hereto, a special relationship existed between GWU and Dr. Montaser, on the one hand, and Plaintiff, a graduate level student, on the other hand.

174.    This special relationship was characterized by a unique degree of trust and confidence between Plaintiff, on the one hand, and GWU and Dr. Montaser, on the other hand, with regard to Plaintiff's education, ideas, and work product. This special relationship placed with Defendants a duty to represent the interests of Plaintiff. Accordingly, GWU and Dr. Montaser had fiduciary duties to act honestly and with the finest and undivided loyalty vis-à-vis Plaintiff at all times relevant hereto.

175.    GWU owed Plaintiff additionally, as its student, fiduciary duties to provide an environment in which Plaintiff could pursue his education and obtain his doctoral degree and to protect Plaintiff against faculty misconduct.

176.   GWU breached its fiduciary duties to Plaintiff by its actions described above, including but not limited to:

   a.   Failing to provide Plaintiff with clear guidelines and requirements for graduation;

   b.   Failing to provide Plaintiff with available lab resources;

   c.   Failing to properly monitor and supervise Dr. Montaser as Plaintiff's academic advisor;

   d.   Failing to investigate Plaintiff's multiple complaints of plagiarism against Dr. Montaser;

   e.   Failing to investigate Plaintiff's multiple complaints of abuse by Dr. Montaser;

   f.   Failing to protect Plaintiff from abuse at the hands of Dr. Montaser;

   g.   Delaying Plaintiff's graduation; and

   h.   Allowing one of its faculty members to steal Plaintiff's work.

   i.   Dr. Montaser breached his fiduciary duties to Plaintiff by his actions described above, including but not limited to:

   j.   Intentionally delaying Plaintiff's graduation;

   k.   Abusing his position of power over Plaintiff;

   l.   Plagiarizing Plaintiff's academic and scientific work;

   m.   Usurping Plaintiff's business opportunities for himself;

   n.   Making false and defamatory statements regarding Plaintiff to other members of the GWU community and to third parties.

31

177.    As a result of GWU's and Dr. Montaser's breaches of fiduciary duty, Plaintiff has suffered harm, including the delay of the award of his Ph.D., lost business opportunities, lost opportunities for academic publications, the theft of his academic and scientific work, harm to his reputation, and emotional distress.

## COUNT II
### (Breach of Express Contract Asserted Against GWU)

178.    Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 177 above as though set forth fully herein.

179.    GWU distributed a number of documents to Plaintiff, including admissions literature and matriculation information given to all doctoral students. Those documents included the University Regulations, the Code of Academic Integrity, the Engineering School's Doctoral Handbook (2010-2011), the Policy and Procedures Regarding Allegations of Research Misconduct (the "Research Misconduct Policy"); the Use and Reproduction of Copyrighted Materials policy (the "Copyrighted Materials Policy"), and the Patent and Scholarly Work Policy ("Scholarly Work Policy").

180.    GWU made a number of specific promises to Plaintiff in the Research Misconduct Policy, including promises that:

>    a.    All employees or individuals associated with GWU should report observed, suspected, or apparent misconduct in research to the Associate Vice President for Research ("AVRP");

>    b.    The Research Misconduct Policy and associated procedures are to be followed when an allegation of possible misconduct is received by a GWU official;

c.  GWU would take appropriate administrative actions against individuals when an allegation of research misconduct has been substantiated, and that such actions may include

- withdrawal or correction of all pending or published abstracts and papers emanating from the research where research misconduct was found;

- removal of the responsible person from the particular project, letter of reprimand, special monitoring of future work, probation, suspension, salary reduction, or initiation of steps leading to possible rank reduction or termination of employment;

- restitution of funds as appropriate;

d.  Upon receiving an allegation of research misconduct, the AVPR will "promptly" assess the allegation;

e.  The AVPR will undertake reasonable efforts to protect complainants who made allegations of research misconduct in good faith;

f.  The AVPR will take appropriate steps during the inquiry and investigation to prevent any known or reasonably suspected retaliation against the complainant.

181.  GWU made a number of specific promises to Plaintiff in the Copyrighted Materials Policy, including promises that:

a.  GWU would comply with federal copyright laws;

b.  GWU "strictly prohibited" the use of copyrighted materials other than in compliance with the law;

c. The Copyrighted Materials Policy and associated guidelines applied to all members of the GWU community.

182.   GWU made a number of specific promises to Plaintiff in the Scholarly Work Policy , including promises that:

a. GWU will  "Assign title to the Invention, Discovery, Technology, or Innovation to the faculty member, staff member, or student"; and

b. GWU will "give due regard to its faculty, staff, and student inventors in making decisions with respect to patents on their inventions and keep its faculty, staff, and student inventors informed of the decisions the University makes."

183.   GWU's actions and inactions, set forth above, constituted material breaches of the contractual promises in the Research Misconduct Policy, the Copyrighted Materials Policy, and the Scholarly Work Policy.

184.   Plaintiff has been injured and suffered damages as a direct and proximate result of GWU's material breaches those contractual promises.

## COUNT III
## (Breach of Implied Contract Asserted Against GWU)

185.   Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 184 above as though set forth fully herein.

186.   An implied contract was formed between GWU and Plaintiff when GWU agreed to grant Plaintiff all the rights, privileges and protections to which GWU doctoral students are entitled in exchange for Plaintiff's agreement to become a graduate student at GWU.

187.   GWU's actions and inactions, described above, constitute a breach of the implied contract between GWU and Plaintiff.

34

188.   Plaintiff has been injured and suffered damages as a direct and proximate result of GWU's breach of the implied contract.

## COUNT IV
### (Breach of Covenant of Good Faith and Fair Dealing Asserted Against GWU)

189.   Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 188 above as though set forth fully herein.

190.   The Contract includes an implied covenant of good faith and fair dealing.

191.   GWU's actions, as described above, evaded the spirit of the Contract, willfully rendered imperfect performance of the Contract, and interfered with Plaintiff's performance of the Contract.

192.   GWU's actions were made in bad faith and with malicious intent and constitute a breach of the implied covenant of good faith and fair dealing.

193.   Plaintiff has been injured and suffered damages as a direct and proximate result of GWU's breach of the implied covenant of good faith and fair dealing.

## COUNT V
### (Negligent Misrepresentation Asserted Against GWU)

194.   Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 193 as though fully set forth herein.

195.   GWU made a number of false statements and/or omissions of fact which it had a duty to disclose to Plaintiff, including:

    a.   Failing to inform Plaintiff of the requirements for receiving his Ph.D. and for graduation;

    b.   Failing to inform Plaintiff that Dr. Montaser had been placed on administrative leave;

c. Failing to inform Plaintiff of the impact that Dr. Montaser's administrative leave would have on Plaintiff's ability to complete his post-graduate program;

d. Representing to Plaintiff that GWU would investigate Plaintiff's complaints about Dr. Montaser;

e. Representing to Plaintiff that the GWU would resolve the outstanding conflicts between Plaintiff's and Dr. Montaser;

f. Representing to Plaintiff that it would investigate the patent claims;

g. Representing to Plaintiff that he could not switch academic advisors;

196.    As a result, Plaintiff has suffered damages including the delay of the award of his Ph.D.; lost economic, academic, and business opportunities; the theft of his academic and scientific work; harm to his reputation and career; and emotional distress.

### COUNT VI
### (Negligence Asserted Against GWU)

197.    Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 196 as though fully set forth herein.

198.    GWU owed Plaintiff a duty of care to protect Plaintiff against faculty misconduct. GWU failed to protect Plaintiff against faculty misconduct. Plaintiff, in turn, was injured by faculty wrongdoing. GWU was in the best position to prevent this kind of faculty misconduct.

199.    Dr. Montaser is an employee and member of the faculty of GWU. GWU, therefore, had a duty to supervise Dr. Montaser.

200.    GWU failed to use reasonable care in supervising Dr. Montaser.

201.    GWU knew or should have known that Dr. Montaser was likely to cause harm to Plaintiff based on the fact that GWU had barred Dr. Montaser from campus for a period of nearly

two years for his unstable and reckless behavior in the past, and based on Plaintiff's own prior complaints of Dr. Montaser's actions.

202.    As a result of GWU's failure to supervise Dr. Montaser, Plaintiff has suffered harm, including the delay of the award of his Ph.D., lost business opportunities, lost opportunities for publishing academic papers, the theft of his academic and scientific work, harm to his reputation, and emotional distress.

## COUNT VII
### (Interference with Prospective Economic Advantage Asserted Against Dr. Montaser)

203.    Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 202 above as though set forth fully herein.

204.    Plaintiff had a reasonable expectancy of securing a paid post-doctoral position following his graduation from the GWU Ph.D. program.

205.    Dr. Montaser had knowledge of Plaintiff's expectancy.

206.    Dr. Montaser intentionally interfered with Plaintiff's expectancy by his actions which delayed Plaintiff's graduation unnecessarily for a number of years, during which time Plaintiff was unable to secure employment.

207.    As a direct and proximate result of Dr. Montaser's actions, Plaintiff suffered harm in the loss of his prospective earnings.

## COUNT VIII
### (Defamation Asserted Against Dr. Montaser)

208.    Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 207 above as though set forth fully herein.

209.    During the summer of 2011, Dr. Montaser contacted Plaintiff's post-doctoral advisor at the Georgetown University to schedule a meeting under the guise of discussing possible research collaboration.

210.    At that meeting, Dr. Montaser made a number of defamatory and false statements about Plaintiff to Plaintiff's post-doctoral advisor. Dr. Montaser knew that the statements were false.

211.    Dr. Montaser's statements were libelous *per se*. Dr. Montaser made the statements in an attempt to dissuade Plaintiff's post-doctoral advisor from hiring Plaintiff and to prejudice Plaintiff in his trade or business.

212.    Plaintiff became aware of the libelous and defamatory statements on September 12, 2011, when his post-doctoral advisor alerted Plaintiff of his meeting with Dr. Montaser.

213.    This action is brought within one year of Plaintiff becoming aware of Dr. Montaser's libelous and defamatory statements.

## COUNT IX
### (Negligent Misrepresentation Asserted Against Dr. Montaser)

214.    Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 213 as though fully set forth herein.

215.    Dr. Montaser made a number of false statements and/or omissions of fact that Dr. Montaser had a duty to disclose to Plaintiff regarding the requirements for Plaintiff's Ph.D. and graduation.

216.    Dr. Montaser intended or should have recognized that Plaintiff would be deleteriously affected by reliance upon Dr. Montaser's misrepresentations and/or omissions.

217.    Plaintiff reasonably relied upon Dr. Montaser's misrepresentations and/or omissions to his detriment.

38

218.   As a direct and proximate result, Plaintiff has suffered damages including the delay of the award of his Ph.D.; lost economic and business opportunities; the theft of his academic and scientific work; harm to his reputation and career; and emotional distress.

## COUNT X
### (Intentional Infliction of Emotional Distress Asserted Against Dr. Montaser)

219.   Plaintiff incorporates by reference the allegations in Paragraphs 1 through 218 as if fully stated herein.

220.   Dr. Montaser's intentional and reckless actions vis-à-vis Plaintiff noted above – including (but not limited to) intentionally delaying Plaintiff's graduation, intentionally abusing his position of power over Plaintiff, intentionally plagiarizing Plaintiff's academic and scientific work, intentionally usurping Plaintiff's business opportunities for himself, and intentionally making false and defamatory statements regarding Plaintiff to other members of the GWU community and to third parties – amounted to extreme and outrageous conduct on the part of Dr. Montaser that caused Plaintiff severe emotional distress.

221.   Dr. Montaser's conduct towards Plaintiff, as described above, was so extreme and outrageous in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

222.   Dr. Montaser's conduct intentionally and recklessly caused Plaintiff severe emotional distress, as noted in detail above.

## COUNT XI
### (Negligent Infliction of Emotional Distress Asserted Against Both Defendants)

223.   Plaintiff incorporates by reference the allegations in Paragraphs 1 through 222 as if fully stated herein.

224.    As his academic supervisor, Dr. Montaser had a special relationship with Plaintiff and undertook an obligation to Plaintiff that necessarily implicated Plaintiff's emotional well-being. Indeed, as noted above, Dr. Montaser had a fiduciary relationship with Plaintiff. As an academic institution, GWU also had a special relationship with Plaintiff and undertook an obligation to Plaintiff that necessarily implicated Plaintiff's emotional well-being. Indeed, as noted above, GWU had a fiduciary relationship with Plaintiff.

225.    Given Dr. Montaser's mental instability and behavioral history, and Plaintiff's continuous complaints to GWU about Dr. Montaser's actions vis-à-vis Plaintiff, there was an especially likely risk that Dr. Montaser would cause serious emotional distress to Plaintiff. Given GWU's knowledge of Dr. Montaser's mental instability and behavioral history, and Plaintiff's continuous complaints to GWU about Dr. Montaser, there was an especially likely risk that GWU's negligence with respect to Plaintiff and Dr. Montaser would cause serious emotional distress to Plaintiff (i.e., that GWU's failure to properly supervise Dr. Montaser and to properly fulfill its obligations to Plaintiff would lead to Plaintiff suffering extreme emotional distress).

226.    Dr. Montaser's and GWU's negligent actions and omissions in breach of their obligations to Plaintiff have, in fact, caused serious emotional distress to Plaintiff, as noted in detail above.

### COUNT XII
### (Tort Liability for Negligent Supervision Asserted Against GWU)

227.    Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 226 as though fully set forth herein.

228.    As stated above, Plaintiff has been harmed by Dr. Montaser's intentional, reckless, negligent and otherwise tortious acts, including but not limited to acts of:

      a.    Interference with prospective economic advantage;

    b.   Defamation;

    c.   Negligent misrepresentation;

    d.   Breach of fiduciary duty;

    e.   Intentional and/or negligent infliction of emotional distress;

229.    As a direct and proximate result of Dr. Montaser's negligent and tortious acts, Plaintiff has suffered damages including the delay of the award of his Ph.D.; lost economic and business opportunities; the theft of his academic and scientific work; harm to his reputation and career; and emotional distress.

230.    Dr. Montaser is and was at all times relevant to this action an agent, employee and member of the faculty of GWU.

231.    GWU had a heightened duty to supervise Dr. Montaser in light of the fact that GWU banned Dr. Montaser from GWU for a period of approximately two years for his erratic, bizarre and threatening behavior towards GWU faculty and students.

232.    GWU was negligent in its supervision of Dr. Montaser.

233.    GWU was negligent in permitting, or failing to prevent, negligent and other tortious conduct by Dr. Montaser.

234.    GWU is liable to Plaintiff for harm resulting from Dr. Montaser's negligent and tortious conduct.

## COUNT XIII
### (Unjust Enrichment Asserted Against Dr. Montaser)

235.    Plaintiff restates and incorporates by reference the allegations of Paragraphs 1 through 234 as though fully set forth herein.

236.    Dr. Montaser was unjustly enriched by obtaining the entire portion of the inventor licensing fee and equity derived from the Artificial Smoke Cigarette.

41

237.   It would be unjust for Dr. Montaser to retain the entire amount because he was not the sole inventor of the Artificial Smoke Cigarette, and he was responsible for excluding Plaintiff from inventorship on the patent application.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against GWU on all counts of this Complaint, and award damages as follows: (1) compensatory damages in an amount to be proven at trial; (2) compensatory damages in an amount to be determined at trial towards Plaintiff's emotional distress; (3) attorneys' fees and costs; (4) punitive damages in an amount to be determined at trial; and (5) any and all other relief to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiff respectfully demands a jury trial in this action.

Dated: September 4, 2012                         Respectfully submitted,

James C. Bailey (D.C. # 462391)
Sara M. Klayton (D.C. # 1001228)
Jason H. Ehrenberg (D.C. # 469077)
Bailey & Ehrenberg PLLC
1015 18th Street, N.W.
Suite 204
Washington, D.C. 20036
T:  (202) 331-1331
F:  (202) 318-7071
jcb@becounsel.com
smk@becounsel.com
jhe@becounsel.com

**Attorneys for Plaintiff**

42



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**500 Indiana Avenue, N.W., Suite 5000**
**Washington, D.C. 20001 Telephone: (202) 879-1133**

Mazdak Taghioskoui
_____
Plaintiff

000720~-12

vs.

Case Number _____

Akbar Montaser
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

James C. Bailey
_____
Name of Plaintiff's Attorney

Bailey & Ehrenberg PLLC
_____
Address
1015 18th Street, NW, suite 204
_____
Washington, D.C. 20036
_____
Telephone    202-331-1331

Clerk of the Court

By _____
Deputy Clerk

Date _____ 6/4/18

如需翻译，请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오    ያማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____
                                        Demandante

                contra                                      Número de Caso:  _____

_____
                                        Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____          *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

                                          Por: _____
_____
Dirección                                                  Subsecretario

_____

                                          Fecha _____
_____
Teléfono
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction       Để có một bài dịch, hãy gọi (202) 879-4828

         번역을 원하시면, (202) 879-4828 로 전화주십시요        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea converser con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CASUM doc





# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

MAZDAK TAGHIOSKOUI PhD
    Vs.                                    C.A. No.        2012 CA 007207 B
THE GEORGE WASHINGTON UNIVERSITY

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order.  Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                            Chief Judge Lee F. Satterfield

Case Assigned to: Judge MICHAEL L RANKIN
Date:  September 4, 2012
Initial Conference: 9:30 am, Friday, December 14, 2012
Location:  Courtroom 517
          500 Indiana Avenue N.W.
          WASHINGTON, DC 20001                              Caio.doc

# ADDENDUM TO INITIAL ORDER AFFECTING
# ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

Filed
D.C. Superior Court
10/16/2012 17:31PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**MAZDAK TAGHIOSKOUI, PH.D.,**

      **Plaintiff,**

v.                                                    **Case No. 0007207-12**

**THE GEORGE WASHINGTON UNIVERSITY**
**and**
**AKBAR MONTASER, PH.D.,**


      **Defendant.**

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## CONSENT MOTION FOR EXTENSION OF TIME TO FILE RESPONSIVE PLEADINGS

Counsel for Defendant Akbar Montaser, Ph.D. ("Montaser") and counsel for Plaintiff Mazdak Taghioskoui, Ph.D. ("Plaintiff") have conferred and agreed to this motion for an extension until November 15, 2012 for Defendant, Akbar Montaser, Ph.D. to file his responsive brief to Plaintiff's Complaint.

Dated: October 16, 2012                    Respectfully submitted,


       /s/ Virginia W. Hoptman_____
      Virginia W. Hoptman (DC Bar No. 367999)
      Lesley Whitcomb Fierst (DC Bar No. 478176)
      WOMBLE CARLYLE SANDRIDGE & RICE, LLP
      8065 Leesburg Pike, 4th Floor
      Tysons Corner, VA  22182-2738
      Telephone: (703) 790-3310
      Facsimile: (703) 790-2623
      vhoptman@wcsr.com

      *Counsel for Defendant Akbar Montaser, Ph.D.*

__ /s/ James C. Bailey_____
James C. Bailey (DC Bar No. 462391)
Sara M. Klayton (DC # 1001228)
Jason H. Ehrenberg (DC # 469077)
Bailey & Ehrenberg PLLC
1015 18th Street, N.W., Suite 204
Washington, DC  20036
Telephone:  202-331-1331
Facsimile:  202-318-7071
jcb@becounsel.com
smk@becounsel.com
jhe@becounsel.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that this Consent Motion for Extension of Time to File Responsive Pleading was served electronically this 16th day of October, 2012 on the following:

William D. Nussbaum
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
william.nussbaum@hoganlovells.com


_____ /s/ Virginia W. Hoptman_____
Virginia W. Hoptman

2

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

MAZDAK TAGHIOSKOUI, PH.D.

        Plaintiff,

v.                          Case No.  0007207-12

THE GEORGE WASHINGTON
UNIVERSITY, et al.,

        Defendants.

## CONSENT ORDER

Counsel for Defendant Akbar Montaser, Ph.D. ("Montaser") and counsel for Plaintiff Mazdak Taghioskoui, Ph.D. ("Plaintiff") have conferred and agreed to an extension of time to November 15, 2012 for Montaser to file a responsive pleading to Plaintiff's Complaint and Jury Demand.

It is hereby ADJUDGED, ORDERED and DECREED that Defendant Montaser shall file and serve his responsive pleading to Plaintiff's Complaint and Jury Demand by November 15, 2012.

ENTERED this _____ day of _____, 2012.


_____

Judge

SEEN AND AGREED:


 /s/ Virginia W. Hoptman
Virginia W. Hoptman (DC Bar No. 367999)
Lesley Whitcomb Fierst (DC Bar No. 478176)
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
8065 Leesburg Pike, 4th Floor
Tysons Corner, VA 22182
Telephone:  703-790-3310
Facsimile:  703-790-2623

Todd D. Ross (DC Bar No. 975943)
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
1200 Nineteenth Street, Suite 500
Washington, DC  20036
Tel.:  202-857-4458
Fax:  202-261-0058
toross@wcsr.com

*Counsel for Defendant Akbar Montaser, Ph.D.*




 /s/ James C. Bailey
James C. Bailey (DC # 462391)
Sara M. Klayton (DC # 1001228)
Jason H. Ehrenberg (DC # 469077)
Bailey & Ehrenberg PLLC
1015 18th Street, N.W., Suite 204
Washington, DC  20036
Telephone:  202-331-1331
Facsimile:  202-318-7071
jcb@becounsel.com
smk@becounsel.com
jhe@becounsel.com

*Counsel for Plaintiff*

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

MAZDAK TAGHIOSKOUI, PH.D,

        Plaintiff,

v.                              Case No.  0007207-12

THE GEORGE WASHINGTON
UNIVERSITY, et al.,

        Defendants.

### NOTICE OF FILING NOTICE OF REMOVAL TO THE CLERK
### OF THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

**PLEASE TAKE NOTICE** that on this 25th day of October, 2012, Defendant Akbar

Montaser, Ph.D. ("Montaser"), by and through his undersigned attorneys, filed in the United

States District Court for the District of Columbia his Notice of Removal of the above-titled

action; a true and correct copy of the Notice of Removal is attached hereto as ***Exhibit 1*** in

accordance with 28 U.S.C. § 1446(d).

Dated:  October 25, 2012           Respectfully submitted,

                                      _____

                                      Virginia W. Hoptman (DC Bar No. 367999)
Lesley Whitcomb Fierst (DC Bar No. 478176)
WOMBLE CARLYLE SANDRIDGE & RICE,
8065 Leesburg Pike, 4th Floor
Tysons Corner, VA 22182
Telephone:  703-790-3310
Facsimile:  703-790-2623
vhoptman@wcsr.com
lfierst@wcsr.com

Todd D. Ross (DC Bar No. 975943)
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
1200 Nineteenth Street, Suite 500
Washington, DC  20036
Telephone:  202-857-4458

**12 1740**

**FILED**

**OCT 2 5** ···

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**EXHIBIT**
**B**

Facsimile:  202-261-0058
toross@wcsr.com

*Counsel for Defendant Akbar Montaser, Ph.D.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of October, 2012, a true and correct copy of

the foregoing Notice of Filing Notice of Removal was sent via first class mail, postage prepaid to

the following:

James C. Bailey
Sara M. Klayton
Jason H. Ehrenberg
Bailey & Ehrenberg PLLC
1015 18th Street, N.W., Suite 204
Washington, DC  20036
*Attorneys for Plaintiff*


William D. Nussbaum
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC  20004
*Counsel for GWU*


_____
Virginia W. Hoptman (DC Bar No. 367999)
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
8065 Leesburg Pike, 4th Floor
Tysons Corner, VA 22182
Telephone:  703-790-3310
Facsimile:  703-790-2623

*Counsel for Defendant Akbar Montaser, Ph.D.*